**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DONALD PLETT,
Plaintiff-Appellant,

v.                                                                              No. 98-1752

UNITED STATES OF AMERICA,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge;
Leonie M. Brinkema, District Judge.
(CA-97-800-A)

Argued: April 6, 1999

Decided: July 23, 1999

Before NIEMEYER, WILLIAMS, and TRAXLER,
Circuit Judges.

_____

Affirmed in part, vacated in part, and remanded for further proceed-
ings by published opinion. Judge Niemeyer wrote the opinion, in
which Judge Williams and Judge Traxler joined.

_____

**COUNSEL**

**ARGUED:** Walter J. Rockler, ARNOLD & PORTER, Washington,
D.C., for Appellant. Charles Foster Marshall, III, Tax Division,
UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Appellee. **ON BRIEF:** Julius M. Greisman, Katherine M.

Breaks, ARNOLD & PORTER, Washington, D.C., for Appellant. Loretta C. Argrett, Assistant Attorney General, Ann B. Durney, Helen F. Fahey, United States Attorney, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

**OPINION**

NIEMEYER, Circuit Judge:

The district court entered a $50,000 judgment in favor of the United States (Internal Revenue Service) against Donald Plett representing the 100% penalty imposed by 26 U.S.C. § 6672, plus interest, for Plett's failure to remit payroll taxes of Wilder & Wilder, Inc. to the United States. The court found that Plett was a person at Wilder & Wilder responsible for collecting, accounting for, and remitting the taxes and that he willfully failed to pay them. Based on the undisputed facts in the record, we affirm the district court's conclusion that Plett was liable under § 6672, but we vacate the judgment and remand for further proceedings to determine the correct amount of liability.

I

The Internal Revenue Code requires that employers withhold federal income taxes and social security taxes from their employees' wages. See 26 U.S.C. §§ 3402(a), 3102(a). Because the employer holds these taxes as "special fund[s] in trust for the United States," 26 U.S.C. § 7501(a) (emphasis added), the withheld amounts are commonly referred to as "trust fund taxes," Slodov v. United States, 436 U.S. 238, 243 (1978) (internal quotation marks omitted). While an employer remains liable for its failure to remit trust fund taxes, the Internal Revenue Code also imposes personal liability, in an amount equal to an employer's deficient taxes, upon those officers or employees (1) responsible for collecting, accounting for, and remitting payroll taxes, and (2) who willfully fail to do so. See 26 U.S.C. § 6672(a); 26 U.S.C. § 6671(b); see also O'Connor v. United States, 956 F.2d 48, 50 (4th Cir. 1992) (outlining elements of § 6672 liability). Section 6672 provides in pertinent part:

2

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a).

The case law interpreting § 6672 generally refers to the person required to collect, account for, and remit payroll taxes to the United States as the "responsible person." See Slodov, 436 U.S. at 246 n.7. But the "responsible person" is not limited to one person in a company but rather may include many persons connected with the same employer. See O'Connor, 956 F.2d at 50; accord Barnett v. Internal Revenue Service, 988 F.2d 1449, 1455 (5th Cir.) ("There may be -- indeed, there usually are -- multiple responsible persons in any company"), cert. denied, 510 U.S. 990 (1993); Bowlen v. United States, 956 F.2d 723, 728 (7th Cir. 1992) (stating that § 6672 casts a "broad net" over many persons in imposing liability for delinquent payroll taxes).

To determine who within a company is a "responsible person" under § 6672, we undertake a pragmatic, substance-over-form inquiry into whether an officer or employee so "participate[d] in decisions concerning payment of creditors and disbursement of funds" that he effectively had the authority -- and hence a duty-- to ensure payment of the corporation's payroll taxes. O'Connor, 956 F.2d at 51. Stated differently, the "crucial inquiry is whether the person had the `effective power' to pay the taxes -- that is, whether he had the actual authority or ability, in view of his status within the corporation, to pay the taxes owed." Barnett, 988 F.2d at 1454 (citations omitted). Several factors serve as indicia of the requisite authority, including whether the employee (1) served as an officer of the company or as a member of its board of directors; (2) controlled the company's payroll; (3) determined which creditors to pay and when to pay them; (4) participated in the day-to-day management of the corporation; (5) possessed the power to write checks; and (6) had the ability to hire

3

and fire employees. See O'Connor, 956 F.2d at 51; United States v. Landau, 155 F.3d 93, 100-01 (2d Cir. 1998); Barnett, 988 F.2d at 1455.

And to determine whether the "responsible person" "willfully" failed to collect, account for, or remit payroll taxes to the United States, we inquire whether the "responsible person" had "knowledge of nonpayment or reckless disregard of whether the payments were being made." Turpin v. United States, 970 F.2d 1344, 1347 (4th Cir. 1992) (internal quotation marks and citations omitted). A responsible person's intentional preference of other creditors over the United States establishes the element of willfulness under § 6672(a). See United States v. Pomponio, 635 F.2d 293, 298 n.5 (4th Cir. 1980). And an intentional preference, in turn, is established by showing that the responsible person "[knew] of or recklessly disregard[ed] the existence of an unpaid deficiency." Turpin, 970 F.2d at 1347.

II

The undisputed facts in the record of this case reveal that Wilder & Wilder, Inc., a hairstyling salon in the Georgetown area of Washington, D.C., failed to remit to the United States payroll taxes for the second, third, and fourth quarters of 1989 and the second quarter of 1990. When Donald Plett filed this refund action to recover from the IRS $1,940 that he had personally paid in partial satisfaction of the IRS' assessment but for which he alleged he was not responsible, the IRS filed a counterclaim to recover from Plett, as a responsible person, the balance of its assessment that it made against Wilder & Wilder.

Wilder & Wilder, named for its two principal hairstylists -- Donald Plett, whose nickname was "Wilder," and Alan Crutcher, who adopted the name "Wilder" because of his relationship with Plett -- was formed in 1986 after Donald Santarelli, a Washington attorney who was a customer of Crutcher, had agreed to help Crutcher open a salon. In February 1986, Santarelli and his investment advisor, Peter Clarke, purchased the assets of an existing beauty salon and transferred them to Wilder & Wilder. Clarke was then designated president/treasurer; Santarelli, vice president; and Plett, secretary. As the key employee, Plett was also given a written employment agreement.

4

Wilder & Wilder opened for business in March 1986. While Santarelli paid the initial bills, hired an outside accountant to maintain the general ledger and other books of the corporation, and worked with Plett to obtain a $15,000 bank loan for operating capital, his responsibilities as a practicing attorney prevented him from assuming an active role in Wilder & Wilder's daily operations. Within the first year, he delegated all decisions as to "what made sense [as] to how to run the shop" to Plett and Crutcher, making clear that his only concern was that the business not get into "trouble with either the bank or the government."

Following Santarelli's initial involvement, Plett and Crutcher operated the business, paying the salon's creditors and employees in the ordinary course of business. In addition to these responsibilities, Plett and Crutcher supervised other hairstylists, purchased supplies, hired and fired employees, scheduled appointments, maintained the cash register, and otherwise operated the salon's business on a daily basis. Further, when the corporation needed capital in 1988, Plett himself signed for a $10,000 bank loan. The salon's outside accountant explained the relative roles of Santarelli on the one hand and Plett and Crutcher on the other:

> [Santarelli] had never run the business. . . . I think he met with [Plett and Crutcher] once a year and maybe gave general business advice. . . . I don't think that they needed Mr. Santarelli's approval for anything, but they were always tight on money.

To assist them in carrying out their financial responsibilities, Plett and Crutcher hired Susan Zuber as a part time bookkeeper. Zuber prepared the salon's accounts payable and payroll records and wrote out the checks which she then presented to Plett or Crutcher for signing and mailing to the salon's creditors. Among the checks that Zuber prepared for signature were those for the salon's federal payroll and income taxes. Zuber acknowledged that she never prioritized the checks with the result that when insufficient funds were available, Wilder & Wilder's employees often received checks while the salon's employment taxes went unpaid.

Even though Zuber believed that Santarelli maintained ultimate responsibility for Wilder & Wilder's financial condition, she inter-

5

acted with Plett and Crutcher on most of the salon's routine financial affairs. She made sure, for instance, to notify Plett and Crutcher of impending or overdue debts, often urging them to pay those debts as soon as possible. On occasion, she pressed Plett and Crutcher to pay the salon's federal payroll taxes "as soon as $ is adequate." Zuber also compiled the payroll and sales tax returns, presenting them to Plett and Crutcher for review and execution. In connection with tax returns, she stated in one memorandum, "When I come in Tuesday, I'll write the checks, You can sign, I'll copy and mail."

In August 1989, with Santarelli's approval, Plett and Crutcher hired a new outside accountant, Lawrence Giles, after the salon's original accountant had ended the relationship when Wilder & Wilder failed to pay his fees. Giles immediately discovered that the salon's financial records were "a mess." In particular, he reported to Plett that the salon was delinquent in failing to pay several months' payroll taxes. Despite this knowledge, Plett permitted the overdue taxes to go unpaid, although he continued to sign checks to pay the salon's other creditors and employees.

In April 1990, Plett signed Wilder & Wilder's federal payroll tax returns for the second, third, and fourth quarters of 1989, but the corporation did not then have the money to pay the taxes due. When Plett notified Santarelli of the overdue taxes, Santarelli expressed "outrage." He stated that the news confirmed his long-held suspicion that Plett and Crutcher were misappropriating the salon's funds. He said, "I became disillusioned with their honesty in running the business. . . . They had a good clientele, and they were not making any money. Something was wrong."

In November 1990, Plett, along with Wilder & Wilder's outside accountants, met with an agent of the IRS to discuss the unpaid payroll taxes. Shortly thereafter, Santarelli terminated Plett's employment, stating in a letter to him, "It has come to[my] attention . . . that you have and are continuing to engage in behavior that is not in the best interest of [Wilder & Wilder] and which may, in fact, constitute criminal behavior." On December 18, 1990, the IRS seized the Wilder & Wilder premises and property.

Almost three years after Wilder & Wilder ceased its operations, the IRS assessed a personal penalty against Plett in the amount of

6

$50,995 for Wilder & Wilder's unpaid employment taxes covering the last three quarters of both 1989 and 1990. When Plett commenced this action against the United States in 1997 to recover a portion of the assessment previously paid by him, the United States filed a counterclaim for the entire amount of the assessment. The assessment was subsequently reduced to $38,582 because the IRS discovered that Wilder & Wilder had satisfied liabilities for the last two quarters of 1990.

On cross-motions for summary judgment, the district court held that Plett was a responsible person who willfully failed to remit Wilder & Wilder's payroll taxes and therefore was personally liable for a penalty in the amount of the unpaid taxes. The court emphasized that Plett, "who is sufficiently educated," signed "essentially all of the checks" and the payroll tax returns, and paid other creditors after learning in August 1989 that Wilder & Wilder was delinquent in paying its payroll taxes. Following a bench trial to determine the amount of Plett's liability, the court entered a judgment against Plett for $50,000, representing a $38,008 trust fund penalty plus interest. This appeal followed.

III

Although Plett acknowledges that he signed checks, loan documents, and tax returns for Wilder & Wilder, he contends that he should not be liable for Wilder & Wilder's unpaid payroll taxes because he possessed no independent control over the salon's financial activities. Plett argues that he was hired "strictly as a hairdresser" who was a "non-owner and subordinate employee of Wilder & Wilder." He claims that he could exercise no independent judgment to make decisions on financial or tax matters. In signing checks, for instance, he claims that he was only doing "as he was told." In conclusion, he asserts that he "had virtually nothing to do with, and no power over, financial affairs."

Plett's contentions that he was "strictly a hairdresser" and had virtually no power to make decisions about financial matters are simply not supported by the undisputed facts in the record. To make such contentions in his brief on appeal, Plett's counsel obviously had to overlook these undisputed facts.

7

The record shows that shortly after Santarelli formed the business and hired its first outside accountant, he turned the daily operations of the business over to Plett and Crutcher. Plett was the corporate secretary, and, as an officer of the corporation, he signed corporate documents, including the corporation's tax returns and a corporate resolution authorizing extraordinary borrowing. More importantly, he supervised the work of Zuber, the bookkeeper, who prepared virtually all of the corporation's financial paperwork for Plett's signature. Plett signed most of the corporation's checks and other day-to-day paperwork. Santarelli's interest was limited to that of an organizer, officer, and investor, whose "only concern was that we didn't get into . . . trouble with either the bank or the government."

Also consistent with this arrangement, Plett hired and supervised other hairstylists, scheduled appointments, collected money from patrons, paid cash-on-delivery vendors, and paid the salon's other creditors and employees. Nothing in the record suggests that Plett lacked authority to write these checks and to satisfy Wilder & Wilder's ongoing obligations, including its tax obligations. Indeed, just the opposite is true. The record reflects that when cash was short, the bookkeeper made that fact known to Plett, and not to Santarelli. While Plett did not have exclusive financial authority, it is undisputed that his authority was sufficient to determine which bills would be paid and which would not. And while vendors and employees were paid, the IRS was not, even though the need to pay the IRS had been brought to Plett's attention.

That Plett was given this level of financial control was manifested by Santarelli's reaction when he learned in April 1990 that the corporation lacked sufficient cash to remit its payroll taxes to the IRS. In addition to expressing outrage, Santarelli testified that he did not understand why "they [Plett and Crutcher] were not making money" because they had good clientele. He stated that"[s]omething was wrong," but he did not know what. He testified that he told Plett and Crutcher, "How can you guys do this? This is real trouble. It's better you don't pay the rent . . . [than] you don't pay that which gives you criminal liability." He also told them, "the salon should be making this money. Where is it going? What's going on?" These are not the expressions of an officer who had day-to-day financial control or was familiar with the salon's cash flow. Such financial control was indis-

8

putably in the hands of Plett, Crutcher, and the bookkeeper they supervised, Zuber.

To determine whether Plett has liability under 26 U.S.C. § 6672(a), we must consider whether he was responsible for collecting, accounting for, and remitting Wilder & Wilder's payroll taxes, and if so, whether he "willfully" failed to fulfill those obligations. Applying the factors described in O'Connor and Landau , it is apparent that Plett was a "responsible person" for purposes of creating § 6672 liability: (1) Plett was an officer of Wilder & Wilder; (2) he controlled its payroll; (3) by paying non-governmental creditors and not paying the United States, he determined which creditors to pay; (4) he was responsible for the day-to-day operations of Wilder & Wilder, including its routine financial affairs; (5) he had the power to sign checks and in fact signed most of them; and (6) he had the power, and exercised it, to hire and fire employees. See O'Connor, 956 F.2d at 51; Landau, 155 F.3d at 101.

To have § 6672 liability, Plett must also have willfully failed to pay the employee withholding taxes. The facts that establish that Plett was financially responsible also establish this "willfulness" requirement. Zuber, the salon's bookkeeper whom Plett supervised, notified Plett as early as 1987 of unpaid federal payroll tax obligations that needed to be satisfied "as soon as $ is adequate." In addition, in August 1989, Wilder & Wilder's outside accountant informed Plett that the salon's books were "a mess" and, in particular, that several months' federal payroll taxes had not been paid. Plett failed to take any action in response to this information. Despite his responsibility to pay ongoing bills, Plett did nothing to pay, or to insure payment of, these taxes. Instead, he permitted the taxes to go unpaid while he continued to write checks to himself and the salon's employees and creditors. Over $200,000 worth of checks, the majority of which Plett signed, cleared Wilder & Wilder's corporate accounts from April to December 1990. These facts readily establish that Plett, if he did not knowingly fail to pay the IRS, certainly recklessly disregarded these tax obligations. See Turpin, 970 F.2d at 1347.

Plett suggests that the summary judgment mechanism was an improper means to resolve the complex issue of his liability under § 6672 because it was "unduly abbreviated." But in the absence of

9

disputed <u>material</u> facts, summary judgment represents a favored mechanism to secure the "just, speedy, and inexpensive determination" of such issues. Fed. R. Civ. P. 1. Summary judgment "does not become disfavored simply because a case is complex" or even if there are <u>some</u> disputed facts. <u>Thompson Everett, Inc. v. National Cable Adver., L.P.</u>, 57 F.3d 1317, 1322-23 (4th Cir. 1995). The essential question presented on a motion for summary judgment remains whether, in the absence of a genuine dispute over <u>material</u> facts, the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c). And the question of whether a given set of facts entitles a party to judgment is a question of law.

In this case, the facts material to whether Plett was a responsible person who willfully failed to remit payroll taxes are undisputed. They show that Plett managed essentially all aspects of Wilder & Wilder's operation; he served as the salon's corporate secretary and signed loan documents and tax returns on behalf of the corporation in that capacity; he signed and issued a majority of the checks to Wilder & Wilder's vendors, creditors, and employees; and he oversaw the work of the salon's bookkeeper. In addition, Plett continued to issue checks to the salon's employees and nongovernmental creditors after receiving notice that the salon was deficient in paying its federal unemployment taxes. These undisputed facts are sufficient to conclude as a matter of law that Plett is liable under § 6672 as a "responsible person."

IV

Plett also contends that the district court clearly erred in finding the amount of his liability because it failed to give him certain offsetting credits.

Following a bench trial, the district court found as fact that Wilder & Wilder's employment tax liability as of 1990 was $52,000, of which $38,008 represented unpaid trust fund taxes. Since Plett's liability under § 6672 applies only to the trust fund liability, which the court computed to be $38,008, the court entered judgment against Plett for $38,008 plus interest, for a total of $50,000.

Plett contends that the district court erroneously failed to credit him with (1) the value of assets seized by the IRS in December 1990; (2)

10

a $4,717 payment that Wilder & Wilder allegedly made with respect to the second quarter of 1989; and (3) a credit for the proceeds of Crutcher's bank account previously seized by the IRS. In addition, Plett contends that the district court erred in failing to apply payments made with respect to unemployment taxes and other miscellaneous payments and refunds.

With respect to the value of assets seized by the IRS in December 1990, the district court found the value of Wilder & Wilder's assets to be $13,500 based on a personal property tax return that it filed with the District of Columbia. Because the IRS permissibly applied this credit first to the non-trust fund liability of Wilder & Wilder, see Buffalow v. United States, 109 F.3d 570, 574-75 (9th Cir. 1997), no amount remained to reduce the trust fund liability in the amount of $38,008 for which Plett was responsible.

With respect to the other credits, the district court simply found that Plett failed in his burden of proof. For instance, with respect to the $4,717, Plett acknowledged that he had no recollection of actually having made that payment, and in the absence of proof that the payment was made, the district court rejected the credit. The district court's factual findings were supported by evidence, or the lack of evidence, and we find no error in the manner that the court applied the law to them, with but one exception.

Shortly before trial, the IRS agreed to dismiss its § 6672 liability claim against Crutcher with the stipulation that "all payments made by Alan Crutcher toward his 100% penalty liability will be applied to Donald Plett's 100% liability." While the parties believe that that amount could exceed $5,000 and they agree that Plett is entitled to a credit for the amount, they do not know what the exact amount is. Because Plett should receive a credit for the Crutcher credits once they have been computed, we vacate the judgment and remand to permit the district court to determine the amounts of these credits and to reduce the judgment accordingly. The district court's rulings in all other respects are affirmed.

AFFIRMED IN PART, VACATED IN PART,
AND REMANDED FOR FURTHER PROCEEDINGS

11